**Application of the PRESIDENT AND DIRECTORS OF GEORGETOWN COLLEGE, INC., a Body Corporate.**

Misc. No. 2189.

United States Court of Appeals
District of Columbia Circuit.

Feb. 3, 1964.

Messrs. Bernard Margolius and Ralph H. Deckelbaum, Washington, D. C., were on the pleadings for Jessie H. Jones, petitioner.

Messrs. Edward Bennett Williams and Peter R. Taft, Washington, D. C., were on the pleadings for President and Directors of Georgetown College, Inc., in opposition.

Before BAZELON, Chief Judge, and WILBUR K. MILLER, FAHY, WASHINGTON, DANAHER, BASTIAN, BURGER, WRIGHT and McGOWAN, Circuit Judges, en banc, in Chambers.

PER CURIAM.

Upon consideration of a pleading styled "Petition for Rehearing En Banc" in the above-entitled matter and an opposition thereto, it is

Ordered by the court *en banc* that said petition is denied.

WASHINGTON, Circuit Judge (concurring):

Mrs. Jones has left the hospital, and the order of September 17th has expired by its own terms. Under these circumstances, we are in my view precluded from passing on the merits of the questions presented, and hence from holding a rehearing *en banc.*

Our denial of a petition for rehearing *en banc,* in this as in all other instances, is not necessarily to be taken as approving the action of a panel or a judge in the matter sought to be reheard. Each judge exercises his own discretion in voting on whether a rehearing should be had, under the circumstances presented. He may or may not agree with the action taken by the panel or a judge. He may think that the merits should not be reached, for a variety of reasons. The question before him is whether the full court should act.[1] Some of the factors to be considered were listed by the late

1. The Supreme Court, which exercises somewhat similar discretionary authority in deciding whether to grant or deny certiorari, has "rigorously insisted that such a denial carries with it no implication whatever regarding the Court's views on

Chief Judge Stephens in an article published several years ago, pointing out that the power to grant hearings by the full court has been "sparingly exercised," and has not been treated as "constituting the court in banc a general court of appeals" from a decision of a panel. Stephens, *Shop Talk Concerning the Business of the Court*, 20 JOURNAL OF THE D. C. BAR ASSOCIATION, 103 at 109 (1953). The same is true of actions taken by a single judge. My own reason for voting for denial of rehearing here has been stated in the preceding paragraph.

DANAHER, Circuit Judge, would dismiss for lack of a case or controversy.

WILBUR K. MILLER, Circuit Judge (dissenting):

In giving the reasons for my unwillingness to agree to the foregoing order, I think it expedient to begin at the beginning by sketching the story of the circumstances which led to its entry; for, standing alone, it has the appearance of an innocuous routine order.

On September 17, 1963, two attorneys appeared at the chambers of District Judge Edward A. Tamm and tendered the following order, which they requested him to sign:

"ORDER

United States District Court
for the District of Colum-
bia Civil Division

"In re: Application of the Presi-
dent and Directors of
Georgetown College, Inc., a
Body Corporate

"This cause having come on to be heard upon application of The President and Directors of Georgetown College, Inc., a body corporate, owning and operating Georgetown University Hospital, and it being represented by counsel for the applicant that a Mrs. Jesse [*sic*] E. Jones is presently a patient at Georgetown University Hospital and that she is in extremis and it being further represented that the physician in attendance, the chief resident at Georgetown Hospital, Edwin Westura, is of the opinion that blood transfusions are necessary immediately in order to save her life and it being further represented by the applicant that consent to the administration thereof can be obtained neither from the patient nor her husband; it is therefore

"ORDERED that the applicant acting through its duly accredited and licensed physicians in attendance may administer such transfusions as are in the opinion of the physicians in attendance necessary to save her life."

Although the proposed order was styled "Application of The President and Directors of Georgetown College, Inc., a Body Corporate," there was no such proceeding pending in the District Court; there had been no complaint, petition or formal written application filed. The only "application" was the oral request of the attorneys that the tendered order be signed and entered. To this day, there is nothing on file in the District Court Clerk's office with reference to this "application." Judge Tamm endorsed on the paper the word "Denied," which of course meant that he was denying the oral application for the order. It is plain, I think, that at the very least Judge Tamm's denial was based on the fact that there was nothing before him upon which he could act, that the jurisdiction of the District Court had not been properly invoked, and that there was no pending case or controversy.

About 4:00 p. m. on September 17 the same attorneys appeared, unannounced, at the chambers of a judge of this court and requested an immediate review of Judge Tamm's action denying the application for authority to administer a

the merits of a case which it has declined to review." Maryland v. Baltimore Radio Show, 338 U.S. 912, 919, 70 S.Ct. 252, 255, 94 L.Ed. 562 (Opinion of Frankfurter, J.).

transfusion to a patient at the hospital, said to be in imminent danger of death from loss of blood. They did not file a written petition for review of Judge Tamm's refusal to sign the order but merely orally requested a single judge to take the action which Judge Tamm had just refused to take. The appellate judge spoke by telephone with the hospital's chief resident physician who confirmed the representations made by counsel and thereupon the judge proceeded to the hospital. There he spoke to the husband of the patient who advised that, on religious grounds, he would not approve a blood transfusion for his wife. The judge advised the husband to obtain counsel immediately but, after brief consideration, the husband declined to do so. The judge then called at the patient's room and repeated to her what the doctors had said. Her only reply audible to him was, "Against my will."

Then, at 5:20 p. m. on September 17, at Georgetown Hospital, the appellate judge signed the order which Judge Tamm had declined to sign and then signed the following additional order, which was filed by our Clerk the same day:

"The applicant having appeared before me for the issuance of a writ permitting the applicant to administer such transfusions as are in the opinion of the physicians in attendance necessary to save the life of Mrs. Jesse [*sic*] E. Jones and it appearing that on September 17, 1963, the District Court denied such application; and a hearing having been conducted before me at which all the interested parties were present and upon due consideration had thereon, I signed, pursuant to the provisions of Section 1651, Title 28, United States Code, the attached order granting such relief which counsel had presented to the District Court Judge and which had been denied by him, it is therefore

"ORDERED that the Clerk of this court is hereby directed to file this memorandum order and attachment."

The blood transfusion was accomplished immediately after the order was signed.

On September 19 the appellate judge filed a memorandum concerning his action, in which he said *inter alia:*

"* * * It was obvious that the woman was not in a mental condition to make a decision. I was reluctant to press her because of the seriousness of her condition and because I felt that to suggest repeatedly the imminence of death without blood *might place a strain on her religious convictions.* I asked her whether she would oppose the blood transfusion if the court allowed it. She indicated, as best I could make out, that it would not then be her responsibility." (Emphasis added.)

And on September 20—three days after the transfusion had been accomplished— the hospital filed affidavits by four physicians to the effect that the transfusion had been necessary.

On October 14, 1963, Jessie E. Jones, the patient, filed a petition for a rehearing *en banc* and for an order vacating and quashing the order of September 17 which authorized the transfusion. The petition states the question presented as follows:

"The question is whether a free adult citizen of the United States can be forced against her will to accept medical treatment to which she objects on both religious and medical grounds.

"This case is of vital importance and rehearing should be granted due to the broad implications of the question presented. The right of free exercise of religion and the right of a free citizen to have his body inviolate are all a part of the rights guaranteed by the Constitution. The problem raised here additionally affects all doctor-patient-hospital relationships throughout the entire country. Thus, while the fact issue may be unusual, the prin-

ciple is broad and vital and these important qualities make this a case which peculiarly calls for reconsideration by the full Court *en banc* and the right of a rehearing."

The petition contains extensive arguments in support of the following propositions:

1. "Respondent has a constitutionally guaranteed right to the free exercise of her religion, which includes the right to 'abstain from blood.' The order of the Court and the action of the applicant in forcing blood upon her is a violation of her conscience and of the liberty guaranteed by the First Amendment to the Constitution of the United States."

2. "Respondent as a free citizen of the United States has been deprived of her liberty by the invasion of her person without due process of law contrary to the Fifth Amendment to the Constitution of the United States."

3. "The precedent created here is a threat to so many other persons that judicial substitution of medical discretion for individual discretion should be examined in principle to see where it is leading."

4. "Respondent is still subject to the order of the Court dated September 17, 1963. Her liberty continues to be infringed until the order is quashed, and the Court should therefore grant a rehearing."

Such is the petition for rehearing *en banc* which is being denied without comment by the foregoing order. I presume the reason which actuates the majority is the theory that the order of September 17 is now moot in that the transfusion has been administered and the patient has left the hospital. The petition for rehearing presents a strong argument to the contrary which merits consideration.

I am not now concerned, however, with the substantive questions presented by the petition for rehearing; I am disturbed by the procedural aspects of the situation. In the description of the nature of the proceedings the petition for rehearing says:

"The procedure by which the matter came before this Court is not clear to counsel, but no issue is raised on the point at this time."

It seems clear to me, however, that the matter did not properly come before this court and that, had it been duly presented on appeal, one judge of this court was not authorized to make a summary disposition of the matter on the merits. These procedural defects are, therefore, fatal to the validity of the purported orders entered September 17 by a single judge when no appeal had actually been filed. Argument that a court is justified, in physical circumstances such as were present here, in ordering blood transfusions against the will of an adult patient necessarily presupposes a properly constituted court and an action actually filed and pending before it. Such argument, no matter how extensive and persuasive, cannot validate the action which was taken here because it cannot destroy the basic facts which make the purported orders mere nullities: that no action was filed in the District Court and that no appeal was filed in this court; and that, had there been an actual appeal, a single appellate judge was not authorized to act.

I object to the order which merely denies the petition for rehearing, without more, because it leaves in effect the two orders of September 17 as orders of this court which may be cited hereafter as precedents, not only for the summary administration of blood transfusions against the will of the patient, but also for the proposition that one judge of this court, without summoning two of his colleagues to act with him and without any record before him, may take the drastic and unprecedented action which was taken in this matter.

Under Article III, Section 2, of the Constitution of the United States, the judicial power extends only to cases and controversies. Although this Section defines and limits judicial power, it does not prescribe the particular method by

which that power may be invoked. The method of invoking it is provided by Rule 3 of the Federal Rules of Civil Procedure, which reads: "A civil action is commenced by filing a complaint with the court." As has been shown, there was no complaint filed here, so a civil action was not commenced and the power of the District Court was not properly invoked. I do not understand that one may institute a civil action merely by entering the chambers of a district judge and asking him to sign a proffered order; nor that an appeal from his refusal may be taken by orally requesting a single circuit judge to review it.

Even when a case or controversy is properly presented to a Court of Appeals, one judge thereof is not empowered to take the decisive action which was taken here. The determination of such matters is committed to a division of three judges, of which two constitute a quorum, or to the court *en banc*. This is provided by subsections 46(b), 46(c) and 46(d) of Title 28 U.S.Code:

"(b) In each circuit the court may authorize the hearing and determination of cases and controversies by separate divisions, each consisting of three judges. Such divisions shall sit at the times and places and hear the cases and controversies assigned as the court directs.

"(c) Cases and controversies shall be heard and determined by a court or division of not more than three judges, unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in active service. A court in banc shall consist of all active circuit judges of the circuit.

"(d) A majority of the number of judges authorized to constitute a court or division thereof, as provided in paragraph (c), shall constitute a quorum. June 25, 1948, c. 646, 62 Stat. 871."

These sections, it seems to me, do not provide for or permit action by a single appellate judge such as that which was taken here. It has been suggested, however, that the Code provision which authorizes one appellate judge to enter an order to preserve the *status quo* pending appeal justifies the procedure employed here. The suggestion is, I think, without foundation. Even if an appeal had properly been in this court from Judge Tamm's refusal to enter the proffered order, the orders entered on September 17 by one judge of this court did not preserve the *status quo*; to the contrary, the orders completely changed the *status quo ante* by granting fully and finally all of the relief sought, thus disposing of the matter on its merits. This fact is confirmed, perhaps unwittingly, by the majority's order denying the petition for rehearing *en banc*, which implicitly relies on mootness.

I think that, instead of merely denying the petition for rehearing, we should dismiss it on the ground that there was no case or controversy presented or determined and that consequently there is nothing to rehear. But, whether the petition for rehearing be denied or dismissed, the purported orders of September 17 should be expunged so there would be nothing in our records which could be cited as a precedent for future similar action by a single appellate judge. We have inherent power to take that action *sua sponte*.

I do not mean to impugn the motives of our colleague who signed these orders. He was impelled, I am sure, by humanitarian impulses and doubtless was himself under considerable strain because of the critical situation in which he had become involved. In the interval of about an hour and twenty minutes between the appearance of the attorneys at his chambers and the signing of the order at the hospital, the judge had no opportunity for research as to the substantive legal problems and procedural questions involved. He should not have been asked to act in these circumstances.

I suggest it is not correct to suppose that, where there is a serious emergency in life, a judge of a district or a circuit

court may act to meet it, regardless of whether he is empowered by law to do so. This situation shows the truth of the adage that hard cases make bad law.

I am authorized to say that BASTIAN and BURGER, Circuit Judges, join this dissent.

BURGER, Circuit Judge.

I believe we should dismiss the petition for rehearing en banc for want of a justiciable controversy, as Judge Danaher does, rather than merely deny it.

This episode presents on the one hand an example of a grave dilemma which confronts those who engage in the healing arts and on the other hand some very basic and fundamental issues on the nature and scope of judicial power.[1] We can sympathize with the one but we cannot safely or appropriately temporize with the other; we have an obligation to deal with the basic question whether any judicially cognizable issue is presented when a legally competent adult refuses, on grounds of conscience, to consent to a medical treatment essential to preserve life. At the outset I would assume that we cannot make a judicial appraisal of justiciability on the basis of any consequences attributable to the order issued in the name of this court. The end, desirable as it obviously developed, cannot establish the existence of a case or controversy if such did not exist independent of the sequel to the enforced medical treatment.

"The touchstone to justiciability is injury to a legally protected right * *." Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 140, 71 S.Ct. 624, 632, 95 L.Ed. 817 (1950) (principal opinion). The threshold issue, therefore, is whether the hospital had a right which it was entitled to require the court to enforce. It is not always easy to separate the concepts of standing of a party and justiciability of an issue; the two tend to blend and merge at times. But it would seem beyond challenge that the party seeking relief has the burden of showing affirmatively a legally protected right which is invaded or is about to be invaded by an opposing party.

What, then, is the legally enforceable "right" of the hospital in this context?

We can assume first that a hospital, like a doctor, has certain responsibilities and duties toward a person who, by choice or emergency, comes under its care. No affirmative act of the patient is suggested as invading or threatening any right of the hospital. So we must decide whether an "invasion" of legal right can be spelled out of a relationship between the patient's refusal to accept a standard medical treatment thought necessary to preserve life and the possible consequences to the hospital if, relying on her refusal of consent, it fails to give a transfusion and death or injury follows. The possible economic impact, apart from the moral implications inherent in its responsibilities, perhaps presented an arguable basis for the hospital's claim of protected economic right. It stood in an unenviable "Good Samaritan" posture when the patient categorically refused to consent to a blood transfusion called for by a medical emergency.[2] The choice between violating the patient's convictions of conscience and accepting her decision was hardly an easy one.

However, since it is not disputed that the patient and her husband volunteered

1. Judge Miller's opinion has dealt with one phase of the problem, i. e., whether assuming *arguendo* the existence of a justiciable controversy, the hospital took the steps necessary to invoke the court's jurisdiction and whether, assuming jurisdiction in the District Court, jurisdiction was properly executed here. I agree with his analysis.

Judge Washington's view that the order of September 17, 1963, has no continuing vitality serves only to underscore the failure of a majority of this court to pass definitively upon the issues presented to us.

2. The existence of an emergency is assumed although there is no record to show when the patient reached the hospital or when an emergency was thought to arise.

to sign a waiver to relieve the hospital of any liability for the consequences of failure to effect the transfusion, any claim to a protected right in the economic damage sphere would appear unsupported.

Can a legally protected right arise out of some other duty-right of the hospital toward a patient, such as a moral obligation to preserve life at all costs?

For me it is difficult to construct an actionable or legally protected right out of this relationship. The affirmative enforcement of a right growing out of a possible moral duty of the hospital toward a patient does not seem to meet the standards of justiciability especially when the only remedy is judicial compulsion touching the sensitive area of conscience and religious belief.[3]

> "Limitation on 'the judicial Power of the United States' is expressed by the requirement that a litigant must have 'standing to sue' or, more comprehensively, that a federal court may entertain a controversy only if it is 'justiciable.' Both characterizations mean that a court will not decide a question unless the nature of the action challenged, the kind of injury inflicted, and the relationship between the parties are such that judicial determination is consonant with what was, generally speaking, the business of the Colonial courts and the courts of Westminster when the Constitution was framed." Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S. at 150, 71 S.Ct. at 637, 95 L.Ed. 817 (separate opinion of Frankfurter, J.).

The Standard suggested by Mr. Justice Frankfurter is not archaic or absolete any more than is the Constitution simply because it is nearly 200 years old. Moreover, Justice Frankfurter did not mean that this concept of justiciability would forever rigidly embalm all remedies and all actions in the mold of 18th century courts. Legal claims concerning atomic energy and the space age may well arise and the standard suggested by Justice Frankfurter is sufficiently malleable to encompass claims and remedies not dreamed of 200 years ago or even a generation ago, provided always they are within the general competence of the courts. What he was pointing to was the appropriateness for *judicial* treatment, the fitness for *adjudication*, which in turn depend upon a showing of invasion of a legally protected right.

The breadth of the Frankfurter definition also makes manifest that he was not addressing himself narrowly to the limited nature of federal judicial power as distinguished from that of state courts of general jurisdiction, for the Colonial courts and those of Westminster of the 1780's were courts of general jurisdiction. Rather he was attempting to contrast the proper scope of judicial business with the business of legislatures, executives and sovereigns, see Pauling v. McNamara, No. 17797, D.C. Cir., Dec. 23, 1963, and, by inference, those matters which are strictly a private concern and thus beyond reach of all governmental power. We cannot neatly divide all of life's problems and decisions into three compartments and assign one to each of the three great Branches of Government.[4]

Mr. Justice Brandeis, whose views have inspired much of the "right to be let alone" philosophy, said in Olmstead v. United States, 277 U.S. 438, 478, 48 S. Ct. 564, 572, 72 L.Ed. 944 (1928), (dissenting opinion):

> "The makers of our Constitution * * * sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—

---

3. Because Mrs. Jones could invoke judicial power to *enjoin* a blood transfusion does not mean, as a corollary, that the hospital has a comparable right to *compel* it.

4. The cases in which vaccination was compelled for smallpox and other communicable diseases are not in point for such compulsion was enforcement of public health measures under the police power.

the most comprehensive of rights and the right most valued by civilized man."

Nothing in this utterance suggests that Justice Brandeis thought an individual possessed these rights only as to *sensible* beliefs, *valid* thoughts, *reasonable* emotions, or *well-founded* sensations. I suggest he intended to include a great many foolish, unreasonable and even absurd ideas which do not conform, such as refusing medical treatment even at great risk.

That judicial power is narrow and limited is a concept deeply embedded in our System. Thus the need for external restraints on the powers of Federal Judges was plainly an important corollary to their constitutionally secured tenure. It was quite as clear in the 1780's as it is today that men are not notorious for exercising self-restraint when they possess both permanent tenure *and* plenary power. Under our System no single Branch of Government has both, and no single Branch of Government could safely be entrusted with both.

Confronted by a unique episode such as this, it seems to me we must inquire where an assumption of jurisdiction over such matters could lead us.[5] Physicians, surgeons and hospitals—and others as well—are often confronted with seemingly irreconcilable demands and conflicting pressures. Philosophers and theologians have pondered these problems and different religious groups have evolved different solutions; the solutions and doctrines of one group are sometimes not acceptable to other groups or sects. Various examples readily come to mind: a crisis in childbirth may require someone to decide whether the life of the mother or the child shall be sacrificed; absent a

timely and decisive choice both may die. May the physician or hospital require the courts to decide? A patient may be in a critical condition requiring, in the minds of experts, a certain medical or surgical procedure. If the patient has objections to that treatment based on religious conviction, or if he rejects the medical opinion, are the courts empowered to decide for him?

Some of our greatest jurists have emphasized the need for judicial awareness of the limits on judicial power which is simply an acknowledgement of human fallibility.

Cardozo, in The Nature of the Judicial Process, said:

> "The judge, even when he is free, is *still* not *wholly free*. He is *not to* innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.' Wide enough in all conscience is the field of discretion that remains."

It is at the periphery of the boundaries of power where the guidelines are less clear that an appealing claim presents difficult choices, but this is precisely the area in which restraint is called for in light of the absolute nature of our powers and the finality which often, as here, attends our acts. But we should heed Cardozo's counsel of restraint and reconcile ourselves to the idea that there are

5. There is another interesting facet which needs only to be mentioned briefly: the emergent nature of the factual situation confronting the hospital demonstrates that what on its face was "interlocutory relief" was really the ultimate relief. Once granted, no more remained for any court to consider. Were we to view the claims now as moot, we would have to acknowl-

edge their mootness as soon as the challenged order was acted upon. This was in effect not only a form of instant relief but perhaps also instant mootness. This does not appear to be a situation of preserving a status quo in order to preserve jurisdiction but rather one where the interim relief was the total relief.

myriads of problems and troubles which judges are powerless to solve; and this is as it should be. Some matters of essentially private concern and others of enormous public concern, are beyond the reach of judges. Cf. Pauling v. McNamara, supra.

I am authorized to state that WILBUR K. MILLER and BASTIAN, Circuit Judges, join in the above views.