CAP SANTA VUE, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Oscar Nelson, President of Cap Santa
Vue, Inc., et al., Intervenors.

Willis CAMPBELL, Jack N. Smith and
Darryl Struthers, d/b/a Valley Manor
Convalescent Center, Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 22251, 22252.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 19, 1969.

Decided Jan. 20, 1970.

884

Mr. William D. Donnelly, Washington, D. C., for petitioners.

Mr. John D. Burgoyne, Atty., National Labor Relations Board, with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, were on the brief, for respondent.

Before BAZELON, Chief Judge, and LEVENTHAL and MacKINNON, Circuit Judges.

MacKINNON, Circuit Judge:

The issue presented on this appeal is whether or not the National Labor Relations Board properly concluded that the Employer-Petitioners (hereafter the Employers) violated section 8(a) (5) and (1) of the National Labor Relations Act [1] by refusing to bargain with the Union, notwithstanding the Employers' contention that their religious beliefs precluded them from dealing with a labor union.

The procedures which brought these two cases before the court are nearly identical. The Building Service Employees' International Union, Local 120, AFL-CIO (hereafter the Union), filed representation petitions seeking, in case No. 22251, to represent certain employees at Cap Santa Vue's convalescent home in Anacortes, Washington,[2] and in case No. 22252, to represent certain employees at the Valley Manor Convalescent Center in Mount Vernon, Washington. In opposition to both petitions, counsel for the respective Employers filed motions to dismiss on the grounds that requiring the Employers to bargain with the Union would contravene their religious beliefs in violation of the free exercise of religion guarantee of the First Amendment of the United States Constitution.[3] The Hearing Officer in each case reserved ruling on these motions for the Board's Regional Director. The Hearing Officers did, however, sustain the Union's objection to the Employers' offer of proof in each case.

---

1. The National Labor Relations Act, ch. 372, 49 Stat. 449 (1935), *as amended,* Labor Management Relations Act, 1947, 29 U.S.C. § 158(a) (1), (5) (1965), provides:

   § 158. Unfair labor practices

   (a) It shall be an unfair labor practice for an employer—

   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

   \*　　\*　　\*　　\*　　\*

   (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

2. Oscar Nelson, President, Eugene Settlemeier, Vice President, and Violet Nelson, Secretary and Treasurer of Cap Santa Vue, Inc., were permitted to intervene in this proceeding. No brief has been filed in behalf of Cap Santa Vue, Inc., or the individual intervenors. These parties have elected to have the brief filed in No. 22252 treated as their brief.

3. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. U.S.Const. Amend. I.

The offer of proof consisted of proffered testimony of two of the Employers and of a former pastor, the head of the Labor Relations Department of the General Conference (the governing body) of the Seventh Day Adventist Church, to the effect that it was the teaching of the Church and the religious belief of the Employers that it was wrong to have anything to do with a labor union. The Employers would have testified that they were born and raised in the Seventh Day Adventist faith, were practicing members thereof and had conscientious religious beliefs in accord with its teachings which were described by the head of the Church's Labor Relations Department.[4]

Thereafter, the Regional Director concluded that the Employers' religious convictions provided them with no insulation from the collective bargaining obligations required by the National Labor Relations Act and denied the Employers' motion to dismiss the election petition.

Elections were then held by both groups of employees, and the Union was selected as the bargaining representative in both cases. Board certification of the Union followed shortly thereafter.

The Employers in both cases then refused to meet with the Union when requested to do so and the Union filed unfair labor practice charges against both Employers under section 8(a) (5) and (1) of the National Labor Relations Act (hereafter the Act). The Employers again asserted their religious convictions as a defense to the charges and the Board, on motion of its General Counsel, granted summary judgment against both employers.[5]

In granting summary judgment, the Board concluded that the Employers' First Amendment contentions had been previously considered and rejected at the representation hearings, and there was therefore no need to grant a second hearing on that issue. The Board found the Employers guilty of violating section 8(a) (5) and (1) of the Act and entered an order which provided that the Employers must "[u]pon request, bargain with the above-named labor organization as the exclusive representative of all employees * * * with respect to rates of pay, wages, hours, and other terms and conditions of employment, and, if an understanding is reached, embody such understanding in a signed agreement."[6] The Employers then petitioned this court for review pursuant to section 10(f) of the Act.

■■ At the time of oral argument in this court Cap Santa Vue, Inc. (a corporation), was requested to submit additional briefs on the question whether, being a corporation, Cap Santa Vue had standing to assert protection under the free exercise of religion guarantee of the First Amendment. Such briefs have not been filed. Instead, Cap Santa

---

4. As members of the Seventh Day Adventist Church, the Employers were not permitted to have anything to do with a labor union because they (1) "cannot be bound to an organization which uses, or as a matter of long practiced policy feels free to use, methods" against which the member has religious convictions and which might force him to break the "law of God" set forth in Matthew, Chapter 19, Verses 16 and 17 and Ecclesiastes, Chapter 12, Verse 13, to "Love his neighbor as himself"; (2) must "conscientiously support the instruction of the Second Corinthians, Chapter 6, Verse 14, which tells them that they should not be unequally yoked with unbelievers"; (3) cannot, in light of Matthew, Chapter 28, Verses 19 and 20, enter into a contract which would

"impair his freedom to select and so position employees as to best achieve his supreme objective in life, to bear witness to the love of God, and salvation to all men"; and (4) have "a moral obligation to deal justly with his employees unhampered by union contracts that may violate his conscientious purpose to do so." Petitioners' and Respondent's Joint Appendix, pp. 44–45.

5. Campbell et al. d/b/a Valley Manor Convalescent Center, 172 N.L.R.B. No. 174 (slip opinion, 1968); Cap Santa Vue, Inc., 172 N.L.R.B. No. 176 (slip opinion, 1968).

6. Campbell et al. d/b/a Valley Manor Convalescent Center, supra at 7; Cap Santa Vue, Inc., supra at 7.

Vue now reports a sale of its "assets" "to a new and non-objecting corporation," contends the cause is now rendered moot as to them, and moves this court to dismiss the Board's proceeding in the Cap Santa Vue case against all parties in the Board's order except the "successors and assigns" of Cap Santa Vue, Inc. But the record before this court is not sufficiently adequate for us to conclude whether Cap Santa Vue, Inc. and its principal stockholders should be dismissed from the proceeding. There may be tag ends to the proceeding that would make advisable their continuance as a party. The order against the original Employer may still turn out to be the indispensable basis for imposing liability on successors and assigns. The vendor and purchaser may have their own difficulties between themselves. And while at first blush, one would conclude that the substitution of an employer who may be described as "non-objecting" will satisfy all problems here present, we conclude that the request of Cap Santa Vue is a matter to be more properly acted upon by the Board in connection with the enforcement of its order. Cap Santa Vue cannot be forced to do an impossibility and since the order runs also in the alternative to "successors and assigns," if the "successors'" compliance with the order is satisfactory, then nothing further is required. So far as is presently known there are no claims for reinstatement of employees for back pay or for damages. The Board order will be enforced to the extent that the sale of the business has not made its enforcement impossible of accomplishment, which the Board may consider in a subsequent proceeding if necessary. N. L. R. B. v. Kostilnik, 405 F.2d 733 (3d Cir. 1969) and cases therein cited, discuss the basic problems. *See also* Southport Petroleum Co. v. N. L. R. B., 315 U.S. 100, 104–107, 62 S.Ct. 452, 86 L.Ed. 718 (1941). And since Cap Santa Vue, Inc. would, under our decision, be required to bargain even if it had standing to raise the free exercise question, we proceed to discuss the basic issue without further reference to the standing question.

## I

■ Our case law has long drawn a distinction between the absolute freedom to *hold* religious beliefs and the freedom of conduct based on religious beliefs, which latter freedom may be curtailed in some circumstances for the protection of society. This proposition was stated by the Supreme Court in Cantwell v. Connecticut, 310 U.S. 296, 303–304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), as follows:

"The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom."

*See also* Braunfeld v. Brown, 366 U.S. 599, 603–604, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); Reynolds v. United States, 98 U.S. 145, 166–167, 25 L.Ed. 244 (1878).

This principle has been repeatedly applied. For example, a state's child-labor law may take precedence over the right of a child to exercise his religion by selling religious literature. Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct.

438, 88 L.Ed. 645 (1944). The refusal to comply with the federal minimum wage law may not be justified on religious grounds, Mitchell v. Pilgrim Holiness Church Corp., 210 F.2d 879 (7th Cir.), cert. denied, 347 U.S. 1013, 74 S.Ct. 867, 98 L.Ed. 1136 (1954), nor may the refusal to pay federal income taxes, Parker v. Commissioner, 365 F.2d 792 (8th Cir. 1966), cert. denied, 385 U.S. 1026, 87 S.Ct. 752, 17 L.Ed.2d 674 (1967). The use of marijuana and other drugs may be prohibited, even when used as part of a religious ceremony. United States v. Kuch, 288 F.Supp. 439 (D.D.C.1968). Finally, we note that the Board has itself held that an employer may not refuse to bargain with a union on the grounds of his religious convictions. Western Meat Packers, Inc., 148 N.L.R.B. 444 (1964), enforcement denied on other grounds, N.L.R.B. v. Western Meat Packers, Inc., 350 F.2d 804 (10th Cir. 1965). It is clear from this line of cases that, in certain circumstances, *conduct* based on one's religion may be regulated for the protection of society.

With this principle the Employers do not disagree. Instead, they argue that section 8(a) (5) and (1) of the Act require more than mere external compliance with an objective law because section 8(d) of the Act requires that the bargaining be performed "in good faith." The Employers argue that the requirement of good faith bargaining makes compliance with the Act impossible for one who does not believe in the Act; hence they conclude that the Act may not be applied to them since, under the Constitution, they may not be compelled to believe in the Act. Cantwell v. Connecticut, *supra*. But the Act is directed at businesses engaged in interstate commerce and not at religious observances.

■ We agree that the Employers may not be compelled to believe in the Act, or anything else for that matter.

Thus the narrow question on this appeal is whether the requirement of "good faith" bargaining in section 8(d) of the Act requires an employer to actually believe in the Act itself in order to bargain in good faith thereunder. It will be helpful to briefly review the history of section 8(d) and the decisions interpreting that section in order to resolve this question.

Section 8(d) of the Act presently provides in relevant part:

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession."

There was no such definition of collective bargaining in the original National Labor Relations Act of 1935.[7] The abuses made possible under the original Act by the absence of a definition of collective bargaining were specifically noted in House Report No. 245 on H.R. 3020, 80th Congress, which later became the Labor-Management Relations Act of 1947.[8] *See* 1 Legislative History of the Labor Management Act, 1947, 310–312 (1948). The Report noted that the Board had set itself up as judge of what concessions an employer must make under the guise of determining whether or not the employer had bargained in "good faith." In order to eliminate this abuse, the House proposed certain objective standards by which it could be determined whether or not a party had refused to bargain. Thus H.R. 3020, as it passed the House, defined collective bar-

7. Ch. 372, 49 Stat. 449 (1935).

8. Ch. 120, 61 Stat. 136 (1947).

gaining to mean compliance with the following minimal requirements:

"(i) receipt of any proposal or counterproposal of the other party;

"(ii) discussion of such proposal and any counterproposal at a conference with the other party held at a time mutually agreeable to the parties or, in the absence of such an agreement, within a reasonable time after such receipt;

"(iii) continued discussion of the matters in dispute at not less than four separate additional conferences with the other party held within the thirty-day period following the initial conference, unless agreement is reached sooner;

"(iv) if an agreement is reached, putting such agreement in writing; * * *." 1 Legislative History of the Labor Management Relations Act, 1947, 164 (1948).

The Senate proposed what became section 8(d) of the present Act, quoted *supra*. This provision was accepted by the House in conference and on this point the House Conference Report No. 510 stated:

The Senate amendment did not, in the definition section, contain any definition of "collective bargaining," but did contain (sec. 8(d)) a provision stating what collective bargaining was to consist of for the purposes of section 8. *It was stated as the performance of the mutual obligation of the parties to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or with respect to the negotiation of an agreement, or with respect to any question arising thereunder; and the execution of a written contract incorporating any agreement reached if desired by either party.\**

This mutual obligation was not to compel either party to agree to a proposal or require the making of any

concession. *Hence, the Senate amendment, while it did not prescribe a purely objective test of what constituted collective bargaining, as did the House bill, had to a very substantial extent the same effect as did the House bill in this regard, since it rejected, as a factor in determining good faith, the test of making a concession and thus prevented the Board from determining the merits of the positions of the parties.* (Emphasis added). 1 Legislative History of the Labor Management Relations Act, 1947, 538 (1948).

We do not find in this legislative history of section 8(d) any indication of a congressional intent that a party to the collective bargaining process must believe in collective bargaining as an economic, social, political or religious philosophy. It is enough if he recognizes it as a legal requirement and complies with that requirement.

We believe we are borne out in this conclusion by the many Board and judicial interpretations of section 8(d) since 1947. For example, it has been said that good faith contemplates a willingness to enter the discussions "with an open mind and purpose to reach an agreement consistent with the respective rights of the parties." Majure v. N.L.R.B., 198 F.2d 735, 739 (5th Cir. 1952). The intent of the parties must be determined, N.L.R.B. v. Call, Burnup & Sims, Inc., 393 F.2d 412, 414 (1st Cir. 1968), and this can only be done by examining their acts, words and motives. Radiator Specialty Co. v. N.L.R.B., 336 F.2d 495, 498 (4th Cir. 1964). Thus it will not do to merely enter "upon a sterile discussion of union management differences," N.L.R.B. v. American National Insurance Co., 343 U.S. 395, 402, 72 S.Ct. 824, 828, 96 L.Ed. 1027 (1942), or "merely going through the motions of negotiating," N.L.R.B. v. Truitt Manufacturing Co., 351 U.S. 149, 154, 76 S.Ct. 753, 757, 100 L.Ed. 1027 (1956)

---

\* The italicized portion refers to the provision of § 8(d) that was substantially similar to the House proposal with the addition of the "good faith" provision.

(Frankfurter, J.). The Fifth Circuit has stated:

> "[O]ne must recognize as well that bad faith is prohibited though done with sophistication and finesse. Consequently, to sit at a bargaining table, or to sit almost forever, or to make concessions here and there, could be the very means by which to conceal a purposeful strategy to make bargaining futile or fail. Hence, we have said in more colorful language it takes more than mere 'surface bargaining,' or 'shadow boxing to a draw,' or 'giving the Union a runaround while purporting to be meeting with the Union for purpose of collective bargaining.'" N.L.R.B. v. Herman Sausage Co., 275 F.2d 229, 232 (5th Cir. 1960).

The Board's approach to the question of good faith may be gleaned from General Electric Co., 150 N.L.R.B. 192 (1964). In that case, the majority replied to a challenge contained in a concurring opinion that the majority's finding of bad faith was based not on the employer's conduct but rather on its technique of bargaining. The majority stated:

> "On the contrary our determination is based upon our review of the Respondent's entire course of conduct, its failure to furnish relevant information, its attempts to deal separately with locals and to bypass the national bargaining representative, the manner of its presentation of the accident insurance proposal, the disparagement of the Union as bargaining representative by the communication program, its conduct of the negotiations themselves, and its attitude or approach as revealed by all these factors." General Electric Co., *supra* at 196.

■ We conclude both from the legislative history and from the decisions interpreting section 8(d) that the Act is concerned not with an employer's *belief* in the Act but with his *conduct* under the Act, including in the term "conduct" not only the process of bargaining but an honest purpose to arrive at an agreement as a result of the process of bargaining.

Thus the term "good faith" was not intended to and does not require an employer to believe in the Act itself. Indeed he may lawfully devote his time, influence and resources to a campaign for a repeal of the Act. An employer is required only to conform to the obligations of the Act, *i. e.*, to recognize, meet and confer with his employees' representatives in an honest attempt to reconcile any differences, and, if an agreement is reached, to reduce it to writing and sign it. The requirement of good faith operates to preclude the parties from conducting the negotiations in bad faith or so that they are a mere sham, and operates to prevent subtle evasions of the requirements of section 8(d).

■ The Employers here are not required to abandon their religious belief that such acts are wrong in order to engage in good faith collective bargaining. They could still prove good faith bargaining if they had honestly attempted to come to some workable agreement despite their belief that what they were doing was wrong in a religious sense.

The case at bar is a good example. The Employers here have absolutely refused to meet with the labor union and so we have a case where there is no collective bargaining and we do not reach the subordinate issue of good or bad faith bargaining. The unfair labor practice here is determined by the fact that the Employers have refused to engage in any collective bargaining.

The Employers concede that their religious beliefs do not justify refusal to engage in the conduct of negotiation, bargaining or contract with the Union if that were all the National Labor Relations Act required, since, in such a situation, they could still maintain unrestricted their belief that such bargaining is wrong. As we have attempted to show above, they err only in arguing that the Act requires more. *Cf.* Application of President and Directors of Georgetown College, Inc., 118 U.S.

App.D.C. 80, 331 F.2d 1000, 9 A.L.R.3d 1367, rehearing denied, 118 U.S.App.D.C. 90, 331 F.2d 1010, cert. denied, Jones v. President and Directors of Georgetown College, Inc., 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964).

## II

■ The Employers next argue that even if their refusal to bargain is deemed to be conduct and therefore within the legislative power to regulate, the Board has failed to make out the requisite compelling public interest necessary to justify the regulation of religion-based conduct. *See, e. g.,* Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); In re Jenison, 267 Minn. 136, 125 N.W.2d 588, 2 A.L.R.3d 1389 (1963).

In Sherbert v. Verner, *supra,* the question presented was whether South Carolina could require the appellant, a Seventh Day Adventist, to work on Saturday as a condition for receiving unemployment compensation benefits. In holding that South Carolina could not so require, the Court stated:

"We must next consider whether some compelling state interest enforced in the eligibility provisions of the South Carolina statute justifies the substantial infringement of appellant's First Amendment right. It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation,' Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430. No such abuse or danger has been advanced in the present case. The appellees suggest no more than a possibility that the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work might not only dilute the unemployment compensation fund but also hinder the scheduling by employers of necessary Saturday work." Sherbert v. Verner,

*supra,* 374 U.S. at 406–407, 83 S.Ct. at 1795.

The same "balancing" approach was taken in In re Jenison, *supra,* from which we quote:

"Upon reconsideration we have come to the conclusion there has been an inadequate showing that the state's interest in obtaining competent jurors requires us to override relator's right to the free exercise of her religion. Consequently we hold that until and unless further experience indicates that the indiscriminate invoking of the First Amendment poses a serious threat to the effective functioning of our jury system, any person whose religious convictions prohibit compulsory jury duty shall henceforth be exempt." In re Jenison, 267 Minn. 136, 137, 125 N.W.2d 588, 589 (1963). *See also* Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); People v. Woody, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964).

We think this line of cases may be distinguished from the case at bar, in which there can be little doubt that there is a compelling public interest in applying the good faith collective bargaining requirement uniformly to all employers and labor unions. As the Supreme Court noted years ago in N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1 at 42, 57 S.Ct. 615 at 626, 81 L.Ed. 893 (1937):

"Experience has abundantly demonstrated that the recognition of 'the right of employees to self-organization and to have representatives of their own choosing for the purpose of collective bargaining is often an essential condition of industrial peace. Refusal to confer and negotiate has been one of the most prolific causes of strife. This is such an outstanding fact in the history of labor disturbances that it is a proper subject of judicial notice and requires no citation of instances."

*See also* N.L.R.B. v. American National Insurance Co., 343 U.S. 395, 402, 72 S.Ct. 824, 828, 96 L.Ed. 1027 (1952) ("Enforcement of the obligation to bargain collectively is crucial to the statutory scheme.")

Accordingly we hold that the bargaining requirements under the Act are sufficiently invested with the public interest to justify applying the good faith bargaining requirement of the Act to the Employers.

In reaching this conclusion, we are aware that the Board may, at some future time, be presented with nice questions relative to the Employers' good faith in bargaining with the Union. Nothing we have said in this opinion is intended to limit the Board's inquiry in this or other cases concerning the determination of good faith. To reach decisions on such issues we expect the Board to continue its practice of considering all relevant circumstances in passing on the ultimate question of good faith.

The decision of the Board is Affirmed.