## In re William J. Dell, II

*Robert Riethmuller,* for petitioners.

BARRY, *J.*, January 8, 1975 — In this case William J. Dell, II, was a patient at the North Hills Passavant Hospital where he was admitted suffering from a bleeding duodenal peptic ulcer. He refused to receive blood transfusions. The hospital made application to the court for the authority to administer an emergency transfusion or such emergency blood transfusions as were necessary to stabilize the physical condition of the patient. Karen Dell, the wife of the 25 year old patient, a registered nurse, joined in the petition and testified before the court that she desired the transfusion to be administered. She also testified that the father of the patient wanted the emergency transfusion. As a matter of fact, it was represented to the court by counsel that the father was en route to join in the petition to the court at the time the emergency hearing was in session. He did not arrive until after the hearing had been concluded. Besides the patient's wife, there was testimony from Howard L. Elstner, a surgeon of the hospital and other hospitals in the Pittsburgh area, as well as Dr. Michael Paul Levis, also a surgeon with similar impeccable credentials. They both testified that the patient's blood volume was only half of normal and that he would die if the transfusion was not administered. The other witness, Walter J. Thomas, assistant director of the hospital, testified to the credentials of both doctors and joined in the prayer of the petition. The court, by order of January 3, 1975, authorized an immediate emergency transfusion. This opinion is written to

state for the record some of the considerations which prompted the order.

There are, to my knowledge, no Pennsylvania cases on point. As the case of Holmes v. Silver Cross Hospital of Joliet, Illinois, 340 F. Supp. 125 (N.D. Ill. 1972), evinces, the few cases that have directly confronted the issue of the right of a Jehovah's Witness or a Christian Scientist to refuse state-ordered medical treatment on religious principles are conflicting in result. In the Holmes case, as a matter of fact, a cause of action was declared by the court to have been stated under the Civil Rights Act of April 20, 1871, 42 U.S.C. §1983, 1985, 17 Stat. 13, against physicians and a hospital. Doctors and hospitals, of course, are on the horns of a dilemma because the courts might very well hold them ultimately liable for their failure to give adequate medical attention to a patient who doesn't want their help. A widow or orphan children might very well have a claim in this respect. Until the United States Supreme Court rules on this delicate question, we think the better rule concerning the right to administer a transfusion is set forth in the case of Application of President of Georgetown College, Inc., 331 F.2d 1010 (D.C. Cir. 1964), certiorari denied, 377 U.S. 978 (1964). The case is cited with approval by the United States Supreme Court in the case of Wisconsin v. Yoder, 406 U.S. 205 (1972) (see also 53 Cal. Law Review 860). In the Georgetown case, a mother refused a transfusion due to religious convictions despite massive internal bleeding caused by a ruptured ulcer. The court in its own words (page 1010), "determined to act on the side of life."

The case of Reynolds v. United States, 98 U.S. 145 (1878), is the first important landmark case

which attempts to balance religious rights and the rights of society. In Reynolds, a Mormon appealed his conviction for bigamy on the grounds of the unconstitutionality of the statute. The United States Supreme Court affirmed the conviction and held that freedom of conscience was absolute but the right to free exercise of religion could not justify acts against the public well-being. As the Holmes case, supra, points out, a state's restriction on free exercise of religion may not be upheld merely because some rational basis exists therefor. The test of validity of state-imposed restriction upon religious freedoms is a balancing test which examines the facts of each particular case focusing upon interests of the state and of its citizens. For example, the so-called "snake cases" provide a precedent for the proposition that the state may act to prevent the individual from consenting to his own death. A small religious sect known as The Holiness Church believes that the true test of faith is the handling of poisonous snakes. A true believer will not be harmed by the snakes. The validity of state statutes making the performance of rites of the church criminal have been upheld by the courts of those states: State v. Massey, 229 N.C. 734, 51 S.E. 2d 179 (1949); Harden v. State, 188 Tenn. 17, 216 S.W. 2d 708 (1949). The Crimes Code of December 6, 1972, P.L. 1068 (No. 334), in section 2505 thereof, 18 C.P.S.A. §2505, makes it a crime to cause another to commit suicide or attempt suicide. The public policy of the Commonwealth thus expresses abhorrence at the act of self-destruction. In the present case, to ignore medical help and advice is in effect to court suicide. It is not a legal wrong to prevent suicide. As the court stated in the Reynolds case it is within the power of government to prevent a religious

suicide. As is stated in the Law Review article mentioned above entitled Unauthorized Rendition of Lifesaving Medical Treatment, 53 Cal. Law Review 860 at 872:

"Because of society's interest in the life of the individual, because of the law's traditional view of the sanctity of human life, and because life can be saved without too great a curtailment of the religious liberty of those patients who refuse treatment on religious grounds, the law should not give its protection to the individual's decision to choose death.

"Society has an interest in the life of the individual. In the Georgetown case, the patient was the mother of a seven-month old child and it is apparent that others than herself would have suffered had she died. Once it is admitted that there is sufficient interest in the life of a particular patient to deny him a legal right to refuse lifesaving treatment, then the decision must be the same for all patients. That is, the criterion of the 'social worth' of the patient would lead the courts into insolvable problems. Any distinction based on 'social worth' in this area is repugnant to the basic ideal of equality: If the mother of several children is to be saved, then so must the childless individual.

"It would be out of line with the law's traditional affirmation of life were it to label the saving of life as either unconstitutional or as a civil wrong. To bring the issue into focus, take the case of a Buddhist monk's attempt to burn himself. Does the individual commit battery if he prevents the attempted suicide? Does a court unconstitutionally deny the free exercise of religion if it acts to prevent the suicide? There seems but one answer.

"To deny the individual a legally enforceable

right to reject lifesaving treatment for religious reasons does not greatly curtail his religious freedom, where objection to treatment is on this ground. First, no criminal sanctions are imposed on him. Second, he is allowed to practice the dictates of his religion in all but the most limited of circumstances: the life and death situation. Third, neither he nor his religion, at least in the case of the Jehovah's Witnesses, will deem him to have sinned. He did not voluntarily breach religious dictates."

Today in our managed society when there are so many necessary and perhaps unnecessary restrictions on individual liberties it is not tyrannical to contend that a person does not have the right to do away with his own life even on sincere religious beliefs. If the Buddhist monks wanted to immolate themselves in Allegheny County should the public allow such self-destruction? Freedom of conscience still remains. The courts have a right to intervene and to choose life rather than death. The right to practice religion freely does not include the right to diminish the respect for life which is the basis of all society.