697 F.Supp. 580 (1988)
Marcia GRAY by her guardian and husband H. Glenn GRAY
v.
Thomas D. ROMEO in his capacity as Director of the Department of Mental Health, Retardation and Hospitals and the State of Rhode Island.
Civ. A. No. 87-0573B.
United States District Court, D. Rhode Island.
October 17, 1988.
*581 Linda S. MacDonald, East Greenwich, R.I., for plaintiff.
John L.P. Breguet, Chief Legal Officer, Dept. of Mental Health, Retardation, and Hospitals, Cranston, R.I., for defendants.
Paul R. Tremblay, Boston College Legal Assistance Bureau, Waltham, Mass., guardian ad litem.
Joseph A. Kelly, Providence, R.I., James Bopp, Jr., Mary M. Nimz, Thomas J. Marzen, Indianapolis, Ind., for amicus curiae, Ethics and Advocacy Task Force of the Nursing Home Action Group.
Dante J. Giammarco on behalf of Philip D. Moran, Salem, Mass., for amicus curiae, Nat. Doctors For Life, Inc. and Nat. Association of Prolife Nurses, Inc.
Kevin A. McKenna, Providence, R.I., Peter W. Gubellini, Fleming, Boyle & Gubellini, Wellesley Hills, Mass., for amicus curiae, Rhode Island Nurses For Life and Paul C. Aspirino III and Geraldine Ann McGarry.
Fenella Rouse, M. Rose Gasner and Elena M. Cohen, Staff Attys., New York City, Charles J. Moore, Providence, R.I. (Richard Wasserman, of counsel), for amicus curiae, Soc. for the Right to Die, Inc.

OPINION
FRANCIS J. BOYLE, Chief Judge.
The Plaintiff Glenn Gray seeks a declaratory judgment authorizing him to direct the removal of a feeding tube and further life support administered to his wife Marcia Gray, who is presently a patient at Rhode Island Medical Center, General Hospital. The effect of removal of the feeding tube or closing off of the feeding tube would be to bring about the death of Marcia Gray.
Marcia Gray was born April 26, 1939. As a child she was both thoughtful and bright. She played the piano and when in high school played the organ in a local Protestant church although she was raised as a Roman Catholic. In 1961 she married her husband Glenn Gray. In the same year she received a Bachelor's Degree from the University of Rochester. She and her husband had two children, Brian, now age twenty-two and Karen, age twenty. In 1973 she obtained a Master's Degree in Library Science from the University of Rhode Island. She has not actively pursued her own career. The Guardian Ad *582 Litem appointed by this Court described Mrs. Gray as follows:
Marcia was described by all as an active, vibrant and very happy woman. She jogged regularly, almost daily on a four mile route near her home by the ocean. She read avidly, both fiction and nonfiction, loved classical music, and continued to play the piano. She spent much of her time with her children, and she had a special love for her garden. She is described as somewhat shy, quite thoughtful and deep, and as very private. She was also described as a proud person who was meticulous about her appearance and how she presented to others.... Marcia Gray is a woman who was and is very much loved by [her] family.
On Saturday, January 4, 1986, Marcia Gray went shopping with her husband Glenn Gray. Although she was a healthy and energetic woman who was rarely, if ever, ill, she developed a sudden and severe headache with serious pain. Immediately brought to South County Hospital, she lost consciousness. A CAT scan showed evidence of significant blood within the right temporal lobe of the brain, evidence of a blood vessel rupture. She was taken by ambulance to Rhode Island Hospital and there Paul Welch, M.D., a neurologist, confirmed a major cerebral hemorrhage. Her family, Glenn Gray, Brian Gray, and Karen Gray were then consulted by Doctor Welch and they consented to a brain operation in an effort to save Marcia Gray's life. A right frontal craniotomy was performed which involved removal of a section of her skullbone and the evacuation of a blood clot which was present in the brain. Surgery established that Marcia Gray had suffered a massive hemorrhage within her cerebrum and within the meninges, the membrane which covers the brain. There was severe brain damage to the right cerebral hemisphere. She did not regain consciousness after surgery and has not regained consciousness to this date. On January 16, 1986 with the consent of Glenn Gray a gastrostomy was performed which involved the creation of a hole in the abdominal wall and into the stomach through which a tube (G-tube) is inserted by which nutrition and hydration may be directly provided to the stomach. Also, an endotracheal tube was inserted in her trachea for the purpose of removing mucus. On February 6, 1986, she developed hydrocephalus, a build up of excessive cerebrospinal fluid in the brain. Further surgery was performed at that time to insert a shunt to drain the fluid. Since that date and June 10, 1986 four separate procedures were applied to correct malfunctions of the shunt.
She developed an infection in the cranial wound which led to the permanent removal of the cranial bone plate. She has as a result a sunken crater on the right side of her head caused by the removal of the bone and the removal and deterioration of brain matter on her right side. On June 24, 1986 she was transferred from Rhode Island Hospital to Rhode Island Medical Center, General Hospital and has remained there.
The court appointed Guardian Ad Litem described her condition as follows:
Marcia Gray has been diagnosed as being in "persistent vegetative state" (PVS). PVS is a type of comatose state in which the cerebral functioning has ceased but in which the brain stem functioning is fully or partially intact. The brain stem controls primitive reflexes, including heart activity, breathing, the sleep/wake cycle, reflexive activity in upper and lower extremities, some swallowing motions and eye movements. Marcia shows signs of each of these activities. The cerebrum, on the other hand, controls sensation and voluntary and conscious activities. Marcia's cerebrum has been damaged severely, and as a result she displays no voluntary or conscious movements, nor does she display any awareness or sensation. This combination of reflexive activity in the absence of sensation or conscious activity is characteristic of PVS. PVS is generally a permanent condition.
At the present time Marcia is fed a liquid formula every four hours which passes through the G-tube and water is provided by the tube in-between feedings. In spite *583 of her "comfort only status" as a patient she is in need of constant attention.
On May 20, 1987, the family, including her husband, her two children, her mother and her sister-in-law requested that her attending physician order that feeding be stopped and that Marcia Gray be permitted to die. The family's request was denied by the hospital. The neurosurgeon who performed the craniotomy and the consulting physician[1] hired by the family agree that there is no "reasonable likelihood of returning to a conscious state" and that there is "no chance" of Maria Gray's recovery. In addition, Mrs. Gray's treating physician since 1986 at the General Hospital states that her chances of recovery to conscious state are "close to zero." Her neurosurgeon expressed the opinion that Marcia Gray's brain stem functions are primarily intact, although not entirely, but she exhibits no conscious, cognitive, sentient responses which would indicate functioning cerebral hemisphere activity. He suggests that her responses to noxious stimuli was of questionable significance given the primitive nature of the startle reflex. He does not believe that she will experience hunger, thirst or pain should the feeding be stopped. He states that because her conscious faculties have ceased to function, she would not experience, in his opinion, that sensory recognition. The consulting physician engaged by Mrs. Gray's family also believes strongly that there is no sensation and hence no pain, thirst, or hunger recognition.
The Guardian Ad Litem has reported to the Court that the hospital as an institution is opposed to denying Mrs. Gray nutrition and hydration because it is tantamount to euthanasia, inconsistent with the physician's role as safekeeper of his or her patient's well being, the fear that the hospital has of civil or criminal responsibility and the reputation which the hospital has an institution for long-term care and the treatment of chronic care patients. Those professional health care personnel who administer to Mrs. Gray's needs presently are unanimous in their adamant opposition to the proposal to remove nutrition and hydration.
Mrs. Gray's family, including her husband, her two children, her mother and her sister-in-law are convinced that it would be her desire not to be sustained with artificial measures if her life were otherwise hopeless. The Guardian Ad Litem reports conversations between Mr. and Mrs. Gray concerning the plight of Karen Ann Quinlan. See In re Quinlan, 70 N.J. 10, 355 A.2d 647, cert. denied sub nom. Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed. 2d 289 (1976). Mr. Gray states that on one occasion Mrs. Gray required that he promise not to keep her alive by artificial means should she ever be in a circumstance similar to Karen Ann Quinlan. The same sentiments were also expressed to him on other occasions by his wife. Her sister-in-law, who was at the time Director of Social Services of a hospice in Chapel Hill, North Carolina, states that Mrs. Gray discussed the plight of Karen Ann Quinlan and was critical of the fact that she was fed artificially and said that she would not want a respirator or a feeding tube if she were in the same circumstances.
This action has been brought on behalf of Marcia Gray by her husband, Glenn Gray, who was appointed guardian of her Person and Estate by the Probate Court, State of Rhode Island. The Plaintiff seeks under the provisions of 42 U.S.C. § 1983 first a declaration that the actions of the Defendants are in violation of the rights secured to Marcia Gray by the Constitution of the United States and secondly seeks an authorization to the Guardian to require the withdrawal of the life support apparatus now administered to Marcia Gray at the Medical Center.
The response of the Defendants has been that this Court lacks jurisdiction because Plaintiff does not have a federal constitutional claim; that it is not legally permitted to withhold food and water from a patient *584 in a persistent vegetative state; that in order to authorize the Guardian as prayed the Court must establish the quantum of process required not only to protect health care personnel involved but also to protect the interest of the patient; and, that because hospital personnel object to the proposed procedure the hospital cannot be directed by this Court to participate.
Although it has been customary to cast actions such as this in the light of raising the issue of a right to die this shorthand expression does not in any sense communicate effectively the nature of this controversy. Essentially this controversy concerns the question of whether or not the State can insist that a person in a vegetative state incapable of intelligent sensation, whose condition is irreversible, may be required to submit to medical care under circumstances in which the patient prefers not to do so. In this light the issues presented do not essentially involve death but essentially relate to life and its circumstances. Due to advances in medical care, it is possible in some circumstances to sustain the body's biological functions for extended periods of time while the patient has no sense of pain or pleasure, fear or joy, love or hate, understanding or appreciation, taste or touch or smell or any other aspect of life's experience, with no realistic possibility of sentient life.
Given the tragic circumstances of Mrs. Gray's condition, the question is who has the right to determine her course of care. She is unable to make a decision. Her family clearly wishes that she should not be further sustained by the provision of nourishment and hydration. The State has its right and, indeed, it may well be said, its duty to continue to provide nourishment and hydration. The issue is how and under what circumstances should either point of view prevail. How is Marcia Gray to be protected?

I
The first question to be resolved is whether Marcia Gray has a federal constitutional right to refuse life-sustaining medical treatment. Put another way, the question is whether the right of privacy, from either the Fourteenth Amendment's due process clause or other constitutional guarantees' penumbras, is broad enough to include a person's right to refuse medical treatment which will result in death.
While the United States Supreme Court has not expressly confronted this issue, the Court's decisions have enunciated a principle of self-determination that encompasses the right of an individual to control his or her own body, subject to certain governmental interests. See, e.g., Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (abortion); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (contraceptives).
Recently, however, the United States Supreme Court has cautioned against an expansive interpretation of privacy rights. Bowers v. Hardwick, 478 U.S. 186, 194, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140, reh'g denied, 478 U.S. 1039, 107 S.Ct. 29, 92 L.Ed. 2d 779 (1986) (courts are "most vulnerable and [come] nearest to illegitimacy when ... [dealing] with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution"). In Bowers, the Court held that the right of privacy did not encompass consensual homosexual activity, noting that sodomy bore no resemblance to family, marriage, or procreation, activities that do come under the umbrella of privacy rights. Id. at 190-91, 106 S.Ct. at 2843-44. The Court stressed that the right of privacy should only include personal decisions that are "`implicit in the concept of ordered liberty,'" id. at 191, 106 S.Ct. at 2844 (quoting Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)), or those that are "`deeply rooted in this Nation's history and tradition.'" Id. at 192, 106 S.Ct. at 2844 (quoting Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)).
The right to control medical decisions affecting one's body is deeply rooted in our country's history and tradition. For instance, in 1891 the Supreme Court held that a court could not order a plaintiff to *585 submit to a surgical examination, stating that
[n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.
Union Pac. Ry. Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891). The Court also noted that "`[t]he right to one's person may be said to be a right of complete immunity: to be let alone.'" Id. (quoting Cooley on Torts, 29). The right to control medical decisions affecting one's body was implicated in Skinner v. Oklahoma ex rel. Williamson, where the Court invalidated on equal protection grounds the sterilization of habitual criminals. 316 U.S. 535, 541-43, 62 S.Ct. 1110, 1113-14, 86 L.Ed. 1655 (1942). Furthermore, in Griswold v. Connecticut, the Court concluded that a statute which prohibited a person from using "`any drug, medicinal article or instrument for the purpose of preventing conception'" violated a federal right of privacy. 381 U.S. 479, 480, 85 S.Ct. 1678, 1679, 14 L.Ed.2d 510 (1965) (quoting Conn.Gen.Stat. § 53-32 (1958 rev.)). See also Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (recognizing an unmarried couple's right of privacy in decisions concerning contraception).
In 1973, in Roe v. Wade, the Court affirmed the principle that a person has the right, grounded in the Fourteenth Amendment's due process clause, to control fundamental decisions involving his or her own body. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed. 2d 147 (1973) (invalidating state abortion prohibitions). The Court noted, of course, that this right of privacy is not absolute, but must be balanced against certain state interests. Id. at 154, 93 S.Ct. at 727 (citing Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (vaccination); Buck v. Bell, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927) (sterilization)). The Court specifically reaffirmed Roe's general principles of personal autonomy in Akron Center for Reproductive Health, Inc. v. City of Akron, 462 U.S. 416, 419-20, 103 S.Ct. 2481, 2487, 76 L.Ed.2d 687 (1983), and in Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 759, 106 S.Ct. 2169, 2178, 90 L.Ed.2d 779 (1986), the latter decided in the same term as Bowers v. Hardwick.
The cases that recognize a federal right to control fundamental medical decisions affecting one's body reflect a concern for an individual's dignity. The Court has emphasized an individual's dignity in maintaining bodily integrity and in controlling decisions about invasive medical procedures in other contexts as well. In Winston v. Lee, for example, the Court held that a criminal defendant could not be compelled to submit to surgery, reasoning that such an intrusion "damage[s] the individual's sense of personal privacy and security." 470 U.S. 753, 762, 105 S.Ct. 1611, 1617, 84 L.Ed.2d 662 (1985). See also Schmerber v. California, 384 U.S. 757, 772, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966) ("[t]he integrity of an individual's person is a cherished value of our society"); Rochin v. California, 342 U.S. 165, 174, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952) (forced stomach pumping "offensive to human dignity").
Thus, although the Supreme Court has never directly addressed the issue of a person's federal constitutional right to refuse life-sustaining medical treatment, the Court's decisions have repeatedly affirmed the principle of individual self-determination. A person has the right, subject to important state interests, to control fundamental medical decisions that affect his or her own body. This right, whether described as the principle of personal autonomy, the right of self-determination, or the right of privacy, is properly grounded in the liberties protected by the Fourteenth Amendment's due process clause. This right is also grounded in the notion of an individual's dignity and interest in bodily integrity.
The right to control fundamental medical decisions is similar in nature to the abortion decision (Roe, Thornburgh), the contraceptive decision (Griswold, Eisenstadt), *586 and the surgical decision (Winston, Botsford). These decisions are extremely personal and the consequences of such decisions may literally be life or death. Decisions concerning medical treatment, therefore, bear little connection to the claimed constitutional right to engage in consensual homosexual acts rejected in Bowers. Instead, the right to control fundamental medical decisions is an aspect of the right of self-determination and personal autonomy that is "deeply rooted in this Nation's history and tradition." Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977).
Indeed, the right to control medical decisions affecting one's body can hardly be questioned. "The root premise is the concept, fundamental in American jurisprudence, that `[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body....'" Canterbury v. Spence, 464 F.2d 772, 780 (D.C.Cir.), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972) (quoting Schloendorff v. Society of New York Hosp., 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914)). In a recent case involving an individual compelled to take antipsychotic drugs, the Fourth Circuit Court of Appeals reiterated this principle:
The right to be free of unwanted physical invasions has been recognized as an integral part of the individual's constitutional freedoms, whether termed a liberty interest protected by the Due Process Clause, or an aspect of the right to privacy contained in the notions of personal freedom which underwrote the Bill of Rights. The right to refuse medical treatment has been specifically recognized as a subject of constitutional protection.
United States v. Charters, 829 F.2d 479, 491 (4th Cir.1987) (footnotes omitted). Cf. Rogers v. Okin, 634 F.2d 650, 653 (1st Cir.1980), vacated for decision according to state law, 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982), on remand, 738 F.2d 1 (1st Cir.1984) ("a person has a constitutionally protected interest in being left free by the state to decide for himself whether to submit to the serious and potentially harmful medical treatment that is represented by the administration of antipsychotic drugs"); Gorman v. University of Rhode Island, 646 F.Supp. 799, 814 (D.R.I.1986), aff'd and rev'd in part, 837 F.2d 7 (1st Cir.1988) (federal constitutional right of privacy includes independence in making decisions whether to seek or decline psychiatric treatment).
The right to control fundamental medical decisions, which includes the right to refuse treatment, reaches its extreme when the decision results in the individual's death. Nevertheless, a person "has a paramount right to control the disposition to be made of his or her body, absent a compelling countervailing governmental interest," even if the decision results in that person's death. Tune v. Walter Reed Army Medical Hosp., 602 F.Supp. 1452, 1454 (D.D.C. 1985). In Tune, the court ordered, in accordance with the patient's wishes, the removal of her life-support system, although such an action would likely result in her immediate death. Id. at 1456. Marcia Gray's right to privacy encompasses the same right to refuse life-sustaining medical treatment.[2]

II
The next issue is whether nutrition and hydration supplied through a gastrostomy tube are a form of medical treatment that Marcia Gray may properly refuse. Courts addressing this issue have concluded that analytically no difference exists between artificial feeding and other life support measures. See, e.g., In re Gardner, 534 A.2d 947, 954 (Me.1987); Brophy *587 v. New England Sinai Hosp., Inc., 398 Mass. 417, 435-39, 497 N.E.2d 626, 636-38 (1986); In re Jobes, 108 N.J. 394, 413 n. 9, 529 A.2d 434, 444 n. 9, stay denied sub nom. Lincoln Park Nursing and Convalescent Home v. Kahn, ___ U.S. ___, 108 S.Ct. 6, 97 L.Ed.2d 796 (1987). Although an emotional symbolism attaches itself to artificial feeding, there is no legal difference between a mechanical device that allows a person to breathe artificially and a mechanical device that artificially allows a person nourishment. If a person has the right to decline life on a respirator, Tune, 602 F.Supp. at 1455-56, then a person has the equal right to decline a gastrostomy tube. Accordingly, Marcia Gray's right to refuse medical treatment includes the right to have the G-tube removed.

III
Although Marcia Gray is now rendered incompetent, she still retains her right to decide whether the G-tube remains implanted or is removed. The right to refuse medical treatment "`must extend to the case of an incompetent, as well as a competent, patient because the value of human dignity extends to both.'" Brophy, 398 Mass. at 431, 497 N.E.2d at 634 (quoting Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 745, 370 N.E.2d 417, 427 (1977)). "`Any other view would permit obliteration of an incompetent's panoply of rights merely because the patient could no longer sense the violation of those rights.'" In re Conroy, 98 N.J. 321, 360, 486 A.2d 1209, 1229 (1985) (quoting Cantor, "Quinlan, Privacy, and the Handling of Incompetent Dying Patients," 30 Rutgers L.Rev. 239, 252 (1977)). Indeed, the United States Supreme Court has recognized that the "law must often adjust the manner in which it affords rights to those whose status renders them unable to exercise choice freely," noting that "those who are irreversibly ill with loss of brain function ... retain `rights,' to be sure, but often such rights are only meaningful as they are exercised by agents acting with the best interests of their principals in mind." Thompson v. Oklahoma, ___ U.S. ___, ___ n. 23, 108 S.Ct. 2687, 2693 n. 23, 101 L.Ed.2d 702 (1988) (plurality opinion).
Recently, the Supreme Court of Rhode Island reviewed the procedure by which an incompetent person could exercise her right to decide whether or not to have an abortion. In re Doe, 533 A.2d 523 (R.I.1987). In Doe, the court stated that there was no question that Doe, if competent, had a constitutional right to terminate her pregnancy. Id. at 525. The court then examined New Jersey and Massachusetts case law, apparently opting for Massachusetts' "substituted judgment" doctrine. Id. at 525-26. Under this doctrine, a court tries to determine what the incompetent's decision would have been had she been in a position to exercise it. The Doe court decided that the state agency, as assisted by the Guardian Ad Litem, was the appropriate surrogate decision maker and upheld the trial court's determination that the incompetent young woman would have decided to terminate her pregnancy. Id. at 526-27.
It is unnecessary to determine in this action how the decision should be made. All are in agreement, including the Court, her husband and her court-appointed guardian, her family, and the Guardian Ad Litem appointed by this Court. Cf. id. at 527.[3] The evidence clearly supports a finding that Marcia Gray, if competent, would exercise her right to refuse the life-sustaining medical treatment.
The court-appointed Guardian Ad Litem concluded that Marcia Gray, if competent, would support her guardian's and family's decision to cease the artificial feeding. First, Marcia Gray's conversations concerning the termination of life-sustaining treatment, *588 especially that with her sister-in-law, clearly indicate Marcia Gray's intent. Second, the depth, quality, and reasoning of the family's prediction of Marcia Gray's intent is impressive. The family speaks with one voice and no apparent conflict of interest exists. The Guardian Ad Litem, summing up his discussion of the substituted judgment approach, stated:
[u]nder this approach, it is rather clear that the substituted judgment decision would be to withhold treatment. Not only is the family unanimous in this prediction, but their reasons are enlightening. They describe Marcia as a very private and dignified woman, and as one who loved life dearly. They feel strongly that she would not want merely to exist as she does now, with frequent handling and manipulation, with no control over her most personal and private functions, with no hope of ever enjoying, appreciating or even experiencing life. They also feel that her commitment to her family would lead her to want to spare the family the great pain which it is enduring during this attenuated dying process.
A decision such as this is not to be made lightly. Yet Marcia Gray's conversations with her husband and sister-in-law and the Guardian Ad Litem's thorough and careful consideration of Marcia Gray's wishes emphasize that Marcia Gray, were she competent, would decline life-sustaining apparatus.

IV
Although Marcia Gray has a constitutional right to refuse life-sustaining medical treatment, no right is absolute. Cf. Roe v. Wade, 410 U.S. 113, 153, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). Accordingly, Marcia Gray's right must be balanced against competing governmental interests that include: the preservation of life, the prevention of suicide, the protection of innocent third parties, and the integrity of medical ethics. See Tune, 602 F.Supp. at 1455. Upon examination, Marcia Gray's interest in self-determination outweighs all governmental interests.
The preservation of life is, of course, the greatest governmental interest. But, governmental interests, like constitutional rights, are not always overriding.
The duty of the State to preserve life must encompass a recognition of an individual's right to avoid circumstances in which the individual himself would feel that efforts to sustain life demean or degrade his humanity. It is antithetical to our scheme of ordered liberty and to our respect for the autonomy of the individual for the State to make decisions regarding the individual's quality of life. It is for the patient to decide such issues. Our role is limited to ensuring that a refusal of treatment does not violate legal norms.
Brophy, 398 Mass. at 434, 497 N.E.2d at 635 (citations omitted). The stated role is not a matter of crossing t's and dotting i's. A serious inquiry is demanded. A judicial determination concerning life is imminently more significant that a determination of dollar damages. These "legal norms" are standards of the highest order. The facts in Marcia Gray's case support the finding that she would consider that efforts now to sustain her life demean her humanity.
Amici argues that in balancing the individual's and the state's interests, courts have distinguished between ordinary and extraordinary medical treatment. While this is a factor to be considered, recent decisions have criticized the distinction as one without meaning. See, e.g., id. at 437, 497 N.E.2d at 637; Conroy, 98 N.J. at 370-74, 486 A.2d at 1234-36. Although the maintenance of the G-tube may not be extraordinary or invasive, the initial insertion of the G-tube certainly was.[4] Moreover, *589 the Brophy court reasoned that maintaining a person by artificial feeding "over an extended period is not only intrusive but extraordinary." 398 Mass. at 437, 497 N.E. 2d at 637. Finally, the United States Supreme Court has stated that "`there is no reason to suppose that the definition of a medical term of art should coincide with the parameters of a constitutional standard.'" Winston v. Lee, 470 U.S. 753, 764 n. 8, 105 S.Ct. 1611, 1618 n. 8, 84 L.Ed.2d 662 (1985) (quoting Lee v. Winston, 551 F.Supp. 247, 260 (E.D.Va.1982)).
However the maintenance of the G-tube is characterized, its continued use, against Marcia Gray's wishes, robs her of the right to determine her course of care. A state's interest in the preservation of life is highest when the state seeks to protect an individual who may potentially be the subject of abuse because he or she cannot protect his or her own interests. That clearly is not the situation here; rather, a number of persons are attempting to ensure that Marcia Gray's wishes are respected. In this situation, therefore, Marcia Gray's right to self-determination must prevail over the state's interest in preserving life for all. See Brophy, 398 Mass. at 438-39, 497 N.E.2d at 638; In re Gardner, 534 A.2d 947, 955 (Me.1987). Cf. Tune, 602 F.Supp. at 1455-56.
The other state interests that are implicated also do not override Marcia Gray's rights. The state interest in preventing suicide is not an issue as there is an obvious distinction between deliberately ending a life by artificial means and allowing nature to take its course. E.g., Tune, 602 F.Supp. at 1455 n. 8; Brophy, 398 Mass. at 439, 497 N.E.2d at 638. In this case, Marcia Gray is unable to chew or swallow. Removal of the G-tube will undoubtedly lead to Marcia Gray's death; her death, however, will essentially be the result of the underlying disease or affliction that prevents her from chewing or swallowing, not the result of a self-inflicted injury. See Conroy, 98 N.J. at 351, 486 A.2d at 1224. "The difference is between self-infliction ... and self-determination." Id. The state's arguments concerning the painful consequences of the decision to forego treatment are hollow in light of the medical testimony that Marcia Gray is incapable of suffering any sensation, including pain.
The state's interest in protection of innocent third parties also does not overcome Marcia Gray's right to self-determination. As the Tune court noted, "[c]onsideration of the rights of innocent third parties is generally limited to situations in which the interests of the patient's dependents may be adversely affected." 602 F.Supp. at 1455 n. 8 (citing Application of the President and Directors of Georgetown College, Inc., 331 F.2d 1000, 1008 (D.C.Cir), reh'g denied, 331 F.2d 1010, cert. denied sub nom. Jones v. President and Directors of Georgetown College, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964)). The rights of Marcia Gray's family will not be adversely affected by allowing her to exercise her right to refuse medical treatment, as they have sought and endorsed that right.
Finally, consideration of the integrity of medical ethics does not present a compelling justification to refuse Marcia Gray's wishes. Indeed, medical ethics incorporates the principle that the patient, not the health care provider, determines what the course of care should be. See Canterbury v. Spence, 464 F.2d 772, 780 (D.C.Cir.), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). The clear and stated policy of the State of Rhode Island both in its legislative and judicial capacities is that a patient has a right to refuse medical treatment. Rhode Island law recognizes this in its enumerated rights of patients: "The patient shall have the right to refuse any treatment by the health care facility to the extent permitted by law." R.I.Gen. Laws § 23-17-19.1(4) (1985) (emphasis added). The state's judicial policy is stated clearly in Wilkinson v. Vesey, 110 R.I. 606, 624-25, 295 A.2d 676, 687-88 (R.I.1972).
*590 Marcia Gray's right to refuse medical treatment therefore overrides any countervailing state interests.

V
The final issue to be resolved is whether the Rhode Island Medical Center should be required to carry out Marcia Gray's wishes or whether the Medical Center and its personnel may refuse to participate in such a procedure.
First, in the context of individual rights, the Constitution rarely commands an affirmative obligation on the government's part; instead, individual rights are stated in the negative, instructing the government on what it cannot do. For example, a State may not under the Fourteenth Amendment deny life or liberty. Thus, the right of procreational autonomy is grounded in the right to make the childbearing decision without governmental interference. Similarly, the right of personal autonomy is the right to make medical decisions affecting oneself free from unwarranted governmental intrusion. In both situations, however, the government is under no constitutional obligation to provide resources to enable an individual to take full advantage of his or her rights. See Harris v. McRae, 448 U.S. 297, 317-18, 100 S.Ct. 2671, 2688-89, 65 L.Ed.2d 784 (1980) (right to be free from governmental interference in abortion decision does not include entitlement to funds necessary to exercise that right).
As mentioned earlier, Rhode Island legislation guarantees a patient the right to refuse medical care. R.I.Gen.Laws § 23-17-19.1(4) (1985).[5] Rhode Island case law also expressly recognizes a patient's right to refuse treatment. See, e.g., Wilkinson v. Vesey, 110 R.I. 606, 625, 295 A.2d 676, 688 (1972) (patient has the "right to be the final judge to do with his body as he wills"), cited with approval in Beauvais v. Notre Dame Hosp., 120 R.I. 271, 275, 387 A.2d 689, 691 (1978). Implicit in this right is that the patient should not be penalized for exercising his or her judgment. "`A decision to forego life-sustaining treatment is not a ground to withdraw all care  nor should care givers treat it in this way....'" In re Jobes, 108 N.J. 394, 426, 529 A.2d 434, 450 (1987) (quoting President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Saving Treatment 90 (1983)). Patients who have decided to forego life-sustaining treatment may still opt for "supportive care  pain control, skin care, and personal hygiene." Steinbrook & Lo, Artificial FeedingSolid Ground, Not a Slippery Slope, 318 New Eng.J.Med. 286, 288 (1988).
The Defendants argue that the principle underlying R.I.Gen.Laws § 23-17-11 (1985), which states that a person associated with a health care facility may refuse on moral or religious grounds to participate in an abortion or sterilization procedure, should apply in this situation. The statute is clearly limited to procedures involving abortion and sterilization. It does not apply to the circumstances of this action.[6]
Marcia Gray and her family had no reason to believe that they were giving up her right to determine her course of care by entering the Rhode Island Medical Center. Cf. Jobes, 108 N.J. at 425, 529 A.2d at 450 ("family had no reason to believe that they *591 were surrendering the right to choose among medical alternatives when they placed ... [Mrs. Jobes] in the nursing home"). The Rhode Island Medical Center apparently did not articulate or notify the Grays of its policy of refusing to participate in a patient's decision to terminate a G-tube's use until after Glenn Gray, on behalf of Marcia, had made such a request. Under these facts, Marcia Gray and her family "were entitled to rely on the ... [hospital's] willingness to defer to their choice among courses of medical treatment." Id. (citing In re Requena, 213 N.J. Super. 443, 517 A.2d 869 (App.Div.), aff'g 213 N.J.Super. 475, 517 A.2d 886 (Ch.Div. 1986)).
Recognition of Marcia Gray's right to terminate nutrition and hydration obviously places a great burden on health care professionals who rank giving food and water to the sick as one of their highest duties. It is fortunate that they are so concerned. Yet, even though Marcia Gray has decided to forego the use of the G-tube, she still needs medical attention. As unsettling as it must be to them, health care professionals must acknowledge Marcia Gray's right of self-determination. Accordingly, if Marcia Gray cannot be promptly transferred to a health care facility that will respect her wishes, the Rhode Island Medical Center must accede to her requests. See R.I.Gen.Laws § 23-17-19.1(4) (1985); Wilkinson, 110 R.I. at 625, 295 A.2d at 688.
ORDERED, that judgment will be granted for the Plaintiff, as prayed.
SO ORDERED.
NOTES
[1] The consulting physician, Doctor William Stone, is Chief of Neurology at a Providence hospital and an Assistant Clinical Professor of Neurology at Brown University Medical School. He is board certified in neurology and internal medicine.
[2] Defendants cite Sanchez v. Fairview Dev. Center, No. CV 88-0129 (C.D.Cal. March 30, 1988), to contradict this proposition. Unpublished opinions, however, are normally not authority because they "usually fail to disclose fully the rationale of the court's decision...." 1st Cir.R. 14. Rule 14 states that unpublished opinions are not to be cited in unrelated cases. Because Sanchez is an unpublished opinion that denied a preliminary injunction and did not reach the merits, this Court may not rely on it. See, e.g., Bachelder v. Communications Satellite Corp., 837 F.2d 519, 523 n. 5 (1st Cir.1988); N.L.R.B. v. Steinerfilm, Inc., 702 F.2d 14, 17 (1st Cir.1983).
[3] The Doe court concluded its opinion by stating that the Guardian Ad Litem and state agencies "acted in good faith and in the best interests of the incompetent person ... and were properly considered by the court as the appropriate surrogates in attempting to exercise substituted judgment in respect to Jane Doe." 533 A.2d 523, 527 (R.I.1987) (emphasis added).

In Marcia Gray's case, no doubt exists as to the good faith on the part of her husband and court-appointed guardian, the Guardian Ad Litem and Marcia Gray's family.
[4] The G-tube was initially inserted with the consent of Marcia Gray's husband. No analytical difference exists between withholding and withdrawing medical treatment, however. A patient's right to refuse medical treatment obviously includes both the right to refrain from beginning the treatment and the right to order its cessation. "Moreover, from a policy standpoint, it might well be unwise to forbid persons from discontinuing a treatment under circumstances in which the treatment could permissibly be withheld. Such a rule could discourage families and doctors from even attempting certain types of care and could thereby force them into hasty and premature decisions to allow a patient to die." In re Conroy, 98 N.J. 321, 370, 486 A.2d 1209, 1234 (1985).
[5] This provision applies to health care facilities licensed under Chapter 17 of Title 23. See R.I. Gen.Laws § 23-17-2(1) (1987). In the joint stipulation of facts, the Rhode Island Medical Center is described as a "fully licensed, acute-care and long-term care hospital." Joint Stipulation of Fact No. 2 (emphasis added).
[6] The defendants also state that 42 U.S.C. § 300a-7(d), which provides that

[n]o individual shall be required to perform or assist in the performance of any part of a health service program ... funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program would be contrary to his religious beliefs or moral convictions [emphasis added]
is applicable here. This provision, however, concerns an individual's rights in connection with a federally funded health service program or research activity. Marcia Gray is not receiving treatment through a "health service program" and therefore 42 U.S.C. § 300a-7(d) does not reach this situation.