[No. A037920. First Dist., Div. Five. Nov. 30, 1988.]

Conservatorship of the Person of THELMA MORRISON.
LOUISE CHILDS, Petitioner and Appellant, v.
BEN ABRAMOVICE et al., Objectors and Respondents.

**COUNSEL**

John R. Weinstein for Petitioner and Appellant.

Louise H. Renne, City Attorney, Dennis Aftergut, Assistant City Attorney, and Gerard J. Donnellan, Deputy City Attorney, for Objectors and Respondents.

**OPINION**

**KING, J.—** In this case we hold that a conservator can authorize the removal of a nasogastric feeding tube from a conservatee who is in a

persistent vegetative state, but cannot require physicians to remove the tube against their personal moral objections if the patient can be transferred to the care of another physician who will follow the conservator's direction. Louise Childs, as conservator of the person of Thelma Morrison, appeals from a judgment denying an injunction. We affirm.

Morrison, now 90 years old, has been a patient at Laguna Honda Hospital since 1979. She is in a persistent vegetative state (PVS), and the prognosis is that her condition will not improve.

A PVS patient has no mental functions. The eyes may be open at times, but the patient is "completely unconscious, i.e., unaware of him[self] or herself or the surrounding environment. Voluntary reactions or behavioral responses reflecting consciousness, volition, or emotion at the cerebral cortical level are absent." (Cranford, *The Persistent Vegetative State: The Medical Reality (Getting the Facts Straight)* (1988) 18 Hastings Center Rep. 27, 28 (hereafter *The Persistent Vegetative State*).) The patient is incapable of experiencing pain and suffering. (*Id.* at p. 31.) PVS has been described as "amentia, an absence of everything for which people value existence." (Wikler, *Not Dead, Not Dying? Ethical Categories and Persistent Vegetative State* (1988) 18 Hastings Center Rep. 41, 47.)[1]

Morrison also suffers from heart disease and two broken legs caused by osteoporosis. Her skin is so fragile that when she is turned in bed a towel must be held under her arms so that her skin does not tear. However, she presently has no terminal illness or disease.

Since 1983 Morrison has been able to receive adequate nutrients only through a nasogastric tube. This is a plastic tube inserted through her nose to her stomach through which she is given a protein-enriched liquid.

Childs is Morrison's daughter and conservator. In a 1984 letter to Ben Abramovice, the hospital administrator, she expressed a desire that Morrison's life not be prolonged artificially and requested removal of the nasogastric tube.

Removal of a nasogastric tube from a PVS patient results in death within one to thirty days. (*The Persistent Vegetative State, supra,* at p. 31.) A

---

[1] "The most commonly cited estimate of the number of PVS patients in the United States is 5,000 to 10,000, and this number can be anticipated to significantly increase in the future, especially when coupled with their increased longevity. [¶] It is not uncommon for patients to survive in this condition for five, ten, and twenty years." (*The Persistent Vegetative State, supra,* at p. 31; see also *Conservatorship of Drabick* (1988) 200 Cal.App.3d 185, 198, fn. 10 [245 Cal.Rptr. 840].)

physician testified at trial that Morrison would develop bedsores within 48 hours after withdrawal of the tube. Despite the presence of bedsores, however, it has been said that "[i]f given adequate nursing care during this withdrawal, including good oral hygiene, PVS patients will not manifest the horrible signs ascribed to this process by some . . . nor will they experience consciously any symptoms (burning of urine, hunger, thirst). [¶] . . . . [P]atients in a persistent vegetative state cannot experience pain and suffering." *(The Persistent Vegetative State, supra,* at p. 31; see also Armstrong & Colen, *From Quinlan to Jobes: The Courts and the PVS Patient* (1988) 18 Hastings Center Rep. 37, 40.)

The hospital refused Childs's request. It subsequently offered to transfer Morrison, at no expense to her or Childs, to any suitable facility that would follow Childs's wishes.[2] The hospital believed that within two weeks it could find a suitable facility.

In 1985 Childs filed this action against Abramovice, the hospital's medical director, and Morrison's attending physician at the time, seeking an injunction requiring removal of the tube. The court denied the request in December 1986. In a written order the court said that although it felt Morrison would probably concur in the request if she were able to, it could find no authority allowing a conservator to withhold consent to life-sustaining medical treatment. The court rendered judgment denying an injunction, and Childs filed a timely notice of appeal.

This case raises two issues. One is resolved by a recent appellate decision; the other is novel in California.

■ The first issue is whether a conservator can authorize the removal of a nasogastric tube from a conservatee who is in a persistent vegetative state. This question is resolved in *Conservatorship of Drabick, supra,* 200 Cal.App.3d 185, which found such authority under Probate Code section 2355.

Section 2355 provides, "If the conservatee has been adjudicated to lack the capacity to give informed consent for medical treatment, the conservator has the exclusive authority to give consent for such medical treatment to be performed on the conservatee as the conservator in good faith based on medical advice determines to be necessary . . . ." (Prob. Code, § 2355, subd. (a).) The court in *Drabick* held "this statute, by necessary implication,

---

[2] Laguna Honda Hospital is a public hospital, and Morrison's expenses there are paid by Social Security, Veterans Benefits and Medi-Cal funds. Consequently this case presents no issue as to who must pay for Morrison's hospitalization while she is kept alive against her conservator's wishes.

gives the conservator power to withhold or withdraw consent to medical treatment under appropriate circumstances." (200 Cal.App.3d at p. 200.) Any contrary construction would render meaningless the statute's reference to a good faith decision. (*Id.* at p. 202.) ■■ The court further held a patient's fundamental right to refuse medical treatment (*Bouvia* v. *Superior Court* (1986) 179 Cal.App.3d 1127 [225 Cal.Rptr. 297]; *Bartling* v. *Superior Court* (1984) 163 Cal.App.3d 186 [209 Cal.Rptr. 220]) is not lost if the patient becomes incompetent, and the only way to maintain any meaning to this right is to allow a conservator to exercise it vicariously. (*Drabick, supra,* 200 Cal.App.3d at pp. 206-209.) "To summarize, California law gives persons a right to determine the scope of their own medical treatment, this right survives incompetence in the sense that incompetent patients retain the right to have appropriate decisions made on their behalf, and Probate Code section 2355 delegates to conservators the right and duty to make such decisions." (*Id.* at p. 205.)

*Drabick* concluded that under Probate Code section 2355 a conservator can authorize removal of a nasogastric tube if the decision is made in "good faith" and is based on "medical advice" which includes "the prognosis that there is no reasonable possibility of return to cognitive and sapient life." (200 Cal. App. 3d at pp. 216-217.)

■ A physician's compliance with the conservator's decision is within the range of medical ethics. Although some believe feeding should never be withheld, the authors of a text on medical ethics state it is ethically correct to remove a nasogastric tube from a patient in a persistent vegetative state. (Jonsen et al., Clinical Ethics (2d ed. 1986) p. 110; cf. Am. Med. Assn., Current Opns. of the Council on Ethical and Jud. Affairs (1986) § 2.18, pp. 12-13 [discontinuation of nutrition and hydration not unethical in case of irreversible coma].)

Respondents do not dispute the holding in *Drabick*. The present case, however, differs from *Drabick* in a fundamental respect. The treating physician in *Drabick* was willing to remove or direct the removal of the nasogastric tube. (200 Cal.App.3d at pp. 190-191.) Here, in contrast, the respondents refused to do so. ■ They contend that since they did not support Childs's request to remove the tube, her decision was not based on medical advice.

The requirement of medical advice cannot, however, reasonably be construed as demanding adherence to a physician's opinion on the ultimate decision whether to remove a nasogastric tube. Otherwise, the conservator's right to refuse medical treatment on behalf of the conservatee would be meaningless. If a patient has the right to reject a physician's recommenda-

tion, so must the patient's conservator under the reasoning of *Drabick*. This conclusion is further supported by the testimony of Childs's medical ethics expert, who opined that a conservator must seek medical advice but is not ethically bound to follow it; rather, the purpose of seeking advice is to obtain information enabling the conservator to formulate a judgment about what is in the patient's best interest.[3]

Childs testified that although she rejected the hospital physicians' opinions as to whether the tube should be removed, she did consult with them to obtain information concerning her mother's condition. This consultation satisfied the requirement of medical advice. The trial court expressly concluded Childs was acting in good faith. The prognosis was that Morrison's condition would not improve. Thus, under Probate Code section 2355 as construed in *Drabick, supra,* 200 Cal.App.3d 185, Childs could authorize the removal of the tube.

■ Regardless of Childs's authority, however, both the medical director and the attending physician testified they had personal objections to removing Morrison's nasogastric tube. This brings us to the second issue: Can a conservator require physicians to remove a nasogastric tube against their personal moral objections? This issue is novel in California. So far, our courts have held only that the *patient* can require physicians to do so. (*Bouvia* v. *Superior Court, supra,* 179 Cal.App.3d 1127; *Bartling* v. *Superior Court, supra,* 163 Cal.App.3d 186.)

The prevailing viewpoint among medical ethicists appears to be that a physician has the right to refuse on personal moral grounds to follow a conservator's direction to withhold life-sustaining treatment, but must be willing to transfer the patient to another physician who will follow the conservator's direction. Childs's medical ethics expert gave testimony to this effect. (See also Jonsen et al., *supra,* at p. 94 ["Physicians may refuse to cooperate in actions they judge immoral on grounds of conscience."].) Ethical principles and guidelines developed by a joint committee of the Los Angeles County medical and bar associations state, "A physician has the right to refuse to participate in continuing or foregoing life-sustaining treatment. In exercising this right, however, the physician must transfer the care of the patient to another qualified physician." (Com. on Biomedical Ethics of L.A. County Medical Assn. & L.A. County Bar Assn., Principles and Guidelines Concerning the Foregoing of Life-Sustaining Treatment for Adult Patients (1985 & 1986) p. 2.)[4] This viewpoint is endorsed in *In re*

---

[3] Childs's medical ethics expert was Albert R. Jonsen, Ph.D., one of the coauthors of Jonsen, Siegler & Winslade, *supra.*

[4] The Los Angeles County principles and guidelines have been characterized as representative of unwritten policy in other locations. (*Conservatorship of Drabick, supra,* 200 Cal.App.3d at p. 199, fn. 11.)

*Guardianship of Grant* (1987) 109 Wn.2d 545, 567 fn. 6 [747 P.2d 445, 456 fn. 6] and *Brophy* v. *New England Sinai Hosp., Inc.* (1986) 398 Mass. 417, 439-441 [497 N.E.2d 626, 638-639].

The same approach appears in California's Natural Death Act, which permits terminally ill patients to execute a directive requiring a physician to withhold or withdraw lifesustaining procedures. (Health & Saf. Code, § 7185 et seq.) The act states, "A failure by a physician to effectuate the directive of a qualified patient pursuant to this division shall constitute unprofessional conduct if the physician refuses to make the necessary arrangements, or fails to take the necessary steps, to effect the transfer of the qualified patient to another physician who will effectuate the directive of the qualified patient." (Health & Saf. Code, § 7191, subd. (b).)[5]

This approach is fair and just, and we shall follow it here. In such cases as this no physician should be forced to act against his or her personal moral beliefs if the patient can be transferred to the care of another physician who will follow the conservator's direction.

Laguna Honda Hospital told Childs it would transfer Morrison at government expense to any suitable facility that would accede to her wishes. She refused the offer. At trial she testified her refusal was based on three reasons: "The first reason is for my mother's condition. [¶] The second reason is that I have tried in the past to find nursing facilities that would take her under her circumstances, and failed. I know that the situation is acute here in this area. [¶] The third reason is that it is my firm belief that no hospital, public or private, has rights of decision that rise above the rights of my mother to decide her own life, and I will hang in there where she is and has been for seven years."

These reasons were not adequate justification for the refusal. The medical director testified Morrison's condition did not preclude her safe and painless transfer to another facility. Abramovice testified there was a high probability the hospital could find a suitable facility in the San Francisco Bay Area within two weeks. Childs presented no contrary evidence.[6]

---

[5] On September 28, 1988, the Governor of California vetoed legislation that would have amended the Natural Death Act to authorize withdrawal of life-sustaining treatment from a PVS patient pursuant to a "right to die" directive previously executed by the patient. (Dresslar, *Deukmejian Vetoes Bill to Extend State 'Right to Die' Law,* S.F. Banner Daily J. (Sept. 29, 1988) p. l, col. 4.)

[6] Childs contends a transfer would violate federal regulations requiring nursing facilities to establish written policies ensuring, among other things, that a patient is transferred or discharged only for medical reasons, the patient's welfare, or under certain circumstances for nonpayment. (42 C.F.R. § 405.1121(k)(4) (1987).) However, a transfer for the purpose of

In view of (1) the hospital staff's personal moral objections to removing the tube, (2) the evidence that Morrison could be transferred to another local facility within two weeks, (3) the hospital's willingness to transfer Morrison at no expense to her or Childs, and (4) Childs's failure to show that no physician could be found who would follow her direction, there was no basis for the court to require the hospital to remove the tube. Thus, although the trial court's reasoning in support of its judgment was contrary to *Drabick,* the judgment itself was correct and must therefore be affirmed. (See *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329-330 [48 P. 117]; *Cohen* v. *Equitable Life Assurance Society* (1987) 196 Cal.App.3d 669, 673 [242 Cal.Rptr. 84].)

This case does not presently pose the dilemma created when no physician can be found who will follow the conservator's direction. (See *Matter of Jobes* (1987) 108 N.J. 394 [529 A.2d 434, 450] [nursing home could not refuse to participate in withdrawal of feeding tube pending transfer of PVS patient in view of evidence it would be extremely difficult or impossible to find another facility that would accept her].) The issue of whether a court could compel physicians to act contrary to their ethical views is too profound for gratuitous discussion in a dictum. Its resolution must await an appropriate case. (But see *Gray by Gray* v. *Romeo* (D.R.I. 1988) 697 F.Supp. 580, 591 [stating hospital could be forced to remove feeding tube if, following judgment, patient could not be transferred to another facility that would do so].)

██ ██ Judicial intervention in "right to die" cases should be minimal. "Courts are not the proper place to resolve the agonizing personal problems that underlie these cases. Our legal system cannot replace the more intimate struggle that must be borne by the patient, those caring for the patient, and those who care about the patient." (*Matter of Jobes, supra,* 108 N.J. 394 [529 A.2d at p. 451].) The court in *Conservatorship of Drabick, supra,* concluded that when a conservator desires removal of life-sustaining treatment, courts should intervene only if there is disagreement among the interested parties, and the court's role is confined to ensuring the conservator has complied with Probate Code section 2355 by making a good faith decision based on medical advice. (200 Cal.App.3d at pp. 198-200.) We add that courts should intervene only if there is disagreement among the conservator and other interested parties *and* they have exhausted all nonjudicial efforts to resolve the dispute. Because of the absence of any attempt to transfer Morrison to another facility and have the nasogastric tube removed by a willing physician, the time for judicial intervention in this case has not yet arrived.

---

enabling a willing physician to remove a nasogastric tube at a conservator's direction is clearly a transfer for medical reasons.

The judgment is affirmed.

Low, P. J., and Haning, J., concurred.